**KAMERMAN, UNCYK, SONIKER & KLEIN P.C.**
COUNSELORS AT LAW
1700 BROADWAY, 42ND FLOOR
NEW YORK, NEW YORK 10019
WWW.KUSKLAW.COM

212/400-4930

July 24, 2019

Judge Mary Kay Vyskocil
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

      Re: Ronald L. Cohen, Esq., Chapter 7 Trustee v. Andrew Charles
           Adversary Proceeding No. 18-01646 (MKV)

Judge Vyskocil:

      I am a Partner at Kamerman, Uncyk, Soniker & Klein P.C., counsel to Defendant in the above captioned action. I write, pursuant to Local Rule 7056-1(a), to seek leave to move for summary judgment and sanctions under Rule 11, 28 U.S.C. § 1927, and 11 U.S.C. § 105.

      Briefly, Debtor is First Wives Entertainment Limited Liability Company ("FWE"). On September 26, 2018, FWE's Trustee filed an adversary proceeding against Charles, alleging FWE fraudulently transferred $300,000.00 from "its bank account" to Charles in August 2014 (Dkt No. 1, ¶ 31). The Trustee further alleged that the money "was for repayment of a loan that [Charles] had made to another entity, and the Debtor received no value on account of the Transfer." (*Id.*, ¶ 32). The truth, as the Trustee admitted at deposition he was well aware at the time he filed his frivolous complaint, was very different.

      First, the Trustee was fully aware at the time he issued the Complaint that the transfer was <u>not</u> made by the Debtor, FWE, but by a related entity, First Wives US/Australia Limited Liability Company ("US/Australia"), from US/Australia's (<u>not</u> Debtor's) bank account (Deposition of Ronald Cohen ("Cohen Dep.") at 34:8-37:16, 57:14-58:4; 97:8-110:9).[1] The Trustee's theory of the case (unpled and unarticulated in the Complaint) is that the principals of US/Australia had a subjective intent to later transfer US/Australia's assets to FWE, and that purported subjective intent – which the Trustee acknowledges was not legally binding – meant that US/Australia's funds transferred to Charles were Debtor's property even though Debtor had no legal or equitable claim on the funds at the time of the transfer. (*Id.* at 34:8-37:16, 94:4-12, 95:4-96:25).[2] Of course, it is axiomatic that only the transfer of property belonging to the Debtor, or in which Debtor had an equitable interest, can support a fraudulent conveyance claim under Section 548 of the Bankruptcy Code. *See In re Plassein Int'l Corp.*, 366 B.R. 318, 326 (Bankr. D. Del. 2007) (no "claim for avoidance of a fraudulent conveyance because the Trustee does not allege that either Plassein or any other Debtor made any transfers ... Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim."), *aff'd*, 388 B.R. 46

---

[1] Copies of the relevant pages of Mr. Cohen's deposition are annexed hereto as Exhibit A.
[2] US/Australia and FWE did not merge; rather, they continued as separate legal entities.

(D. Del. 2008), *aff'd*, 590 F.3d 252 (3d Cir. 2009). Because it is undisputed that no property of the Debtor was conveyed, and no conveyance was made by Debtor, Charles is entitled to summary judgment. Moreover, because the Trustee and his counsel were aware of this at the outset of the case, the action is frivolous, and the Trustee's and counsel's repeated refusals to dismiss the litigation is sanctionable.

Second, that is not the only frivolous aspect of this case. The Trustee was equally aware, at the time that he issued the Complaint, that the payment to Charles was made by US/Australia on account of the $300,000.00 debt Reach Out Entertainment ("ROE") owed Charles. (Cohen Dep. at 38:7-19; 57:14-59:4). The Trustee was fully aware that at the time of the allegedly fraudulent transfer, US/Australia owed ROE significantly more than $300,000.00. (*Id.* at 170:11-21; 185:10-187:13). And the Trustee acknowledged that had the payment to Charles been made first to ROE, and then from ROE to Charles, he would not have filed the fraudulent conveyance action against Charles. (*Id.* at 163:15-166:3; 185:10-187:13).

But it is well-settled that a debtor's payment to a third party on behalf of a creditor, which reduces the debtor's own debt to that creditor, is "value" for purposes of a fraudulent conveyance claim. *See Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 992 (2d Cir. 1981) ("fair consideration will often exist for a novation, where the debtor's discharge of a third person's debt also discharges his own debt to that third person"); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Benefit to a debtor need not be direct; it may come indirectly through benefit to a third person"); *Barr Creelman Plumbing Supply Co. v. Zoller*, 109 F.2d 924, 926 (2d Cir. 1940) ("[i]t would have been proper for [Debtor] to satisfy part of its debt to [Creditor] by writing these checks in favor of [Creditor]'s creditor, the appellant"). Thus, <u>even if</u> US/Australia was the equivalent of the Debtor for purposes of a fraudulent conveyance action, the Trustee was fully aware, at the time he issued the Complaint, that US/Australia (and the Debtor) received exactly equivalent value for the conveyance.

Despite these facts and clearly established law, which counsel for Mr. Charles has repeatedly called to the attention of counsel for the Trustee, the Trustee and his counsel have repeatedly refused to voluntarily dismiss the action. Given the lack of any colorable basis for the Trustee's claims (from the time they were made to the present),[3] and that the Trustee pled his claims in a manner that hid his contention that US/Australia's assets could be deemed Debtor's (by falsely alleging that the transfer was made from Debtor's bank account), and thereby precluded a motion to dismiss, sanctions are appropriate. *See In re Khan*, 488 B.R. 515, 535 (Bankr. E.D.N.Y. 2013), *aff'd sub nom. Dahiya v. Kramer*, No. 13-CV-3079 DLI, 2014 WL 1278131 (E.D.N.Y. Mar. 27, 2014), *aff'd sub nom. In re Khan*, 593 F. App'x 83 (2d Cir. 2015). Leave to move for summary judgment and sanctions should be granted.

Respectfully submitted,

*/s/ Akiva M. Cohen*

Akiva M. Cohen

AMC:cl

---

[3] The Trustee repeatedly testified that his ignorance of the well-settled law governing novation was the basis for ***all*** of the adversary proceedings he brought. (Cohen Dep. at 170:22-174:6; 182:4-25).

**EXHIBIT A**

```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
In re:

FIRST WIVES ENTERTAINMENT LIMITED
                    Chapter 7
                    Case No. 16-11345 (MKV)

                    Debtor.
------------------------------------------x
RONALD L. COHEN, ESQ., Chapter 7 Trustee of
The Estate of FIRST WIVES ENTERTAINMENT
LIMITED LIABILITY COMPANY
                    Adv. Pro No 18-01646 (MKV)
                        Plaintiff,

                    V.

ANDREW CHARLES,

                        Defendant.
------------------------------------------x
Volume 2


    CONTINUED DEPOSITION OF RONALD COHEN
            New York, New York
            Monday, July 1, 2019
```

Reported by:
Mark Richman, CSR, RPR, CM
Job No. 163119

## Page 32

July 1, 2019
10:30 A.M.

Continued Deposition of RONALD COHEN, held at the offices of KAMERMAN, UNCYK, SONIKER & KLEIN P.C., 1700 Broadway, 42nd Floor, New York, New York, New York before Mark Richman, a Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the State of New York.

## Page 33

APPEARANCES:

ROSEN & ASSOCIATES
Attorneys for Plaintiff
    747 Third Avenue
    New York, New York 10017
BY: SANFORD ROSEN, ESQ.
    JUSTIN RYU, ESQ.


KAMERMAN, UNCYK, SONIKER & KLEIN
Attorneys for Defendant
    1700 Broadway
    New York, New York 10019
BY: AKIVA COHEN, ESQ.

## Page 34

RONALD COHEN
    RONALD COHEN, called as a witness, having been first duly sworn by the Notary Public (Mark Richman), was examined and testified as follows:
    EXAMINATION BY MR. COHEN:
    Q.  Thank you for coming back. I just want to make sure that I completely understand your testimony from the last time you were here. The trustee's position with respect to the transfer alleged here is it was a transfer from First Wives US/Australia Ltd. to my client Mr. Charles, correct?
    A.  In part. Correct in part.
    Q.  Which part of it is not correct?
    A.  Because I believe we've -- I stated last time -- I don't have the transcript before me and I have not had a chance to review it -- but whatever it says it says. But I believe our position has been at the time of that transfer it was the intent and purpose of people at, running First Wives US

## Page 35

RONALD COHEN
that First Wives Australia, that entity would be rolled into or was in the process of being rolled into First Wives, the debtor here, and that that transfer was therefore of assets of the debtor here.
    Q.  Okay.
    A.  That's our position.
    Q.  Understood. Understood.
    A.  Just so that's clear.
    Q.  And you anticipated my next question so I think we're all on the same page. I believe you alleged in your complaint in this action that that was actually, that transfer to Mr. Charles was actually the payment of another company's debt to him, correct, Reachout Entertainment, yes?
    A.  That's what we understood, yes.
    Q.  Now, in your complaint you described the bank account that the money came out of as the debtor's bank account. Do you recall that?
    A.  What I do recall is that we

Page 36

RONALD COHEN

allege it was its property that was transferred ant the use of the word its in my view would cover such a situation as I just described in my prior answer.

Q. Okay. If you said that it came out of its account, the debtor's account, would that have been an accurate statement?

A. I believe it would be accurate to the extent that you can understand, as we have alleged, as I said earlier, this was --

MR. ROSEN: Objection.

Q. Okay, you can continue your answer.

A. My answer is that partly you're asking legal conclusion, I think. But beyond that issue, my understanding is that the people running First Wives, the debtor at that time intended and were in process of effectuating what I'll call the turnover or the use of the assets of First Wives Australia to deal with First Wives US. And shortly thereafter the

Page 37

RONALD COHEN

transfer to you, they did effectuate a transfer of the money in First Wives Australia bank account into a separate bank account of the debtor.

So whether at the time of the transfer of the First Wives Australia was already the debtor's account or in the process of becoming the debtor's account or was an alter ego of the debtor where one entity was an alter ego of the other and therefore the property was the debtor's property, that's all to be determined by the court I would assume, but that's where we are going on the facts.

Q. You've alleged that the transfer to Mr. Charles was a fraudulent conveyance, correct?

A. Correct.

Q. And as you understand it, that means that the debtor didn't get fair value in exchange for that transfer, correct?

MR. ROSEN: Objection.

Page 38

RONALD COHEN

A. You're stating a legal conclusion. But my understanding is yes, that's the debtor did not receive their value, the payment of that other company's debt.

Q. If you believed that the debtor had received fair value, would you have authorized this claim?

MR. ROSEN: Objection.

A. The answer is it would not meet the legal criteria of a fraudulent transfer.

Q. Given your position --

A. By the way, the other company we are talking about was not First Wives Australia.

Q. Reachout Entertainment?

A. Yes.

Q. You sort of anticipated my next question. If you at First Wives US/Australia had received fair value in exchange for this transfer, would you have authorized bringing a fraudulent conveyance claim?

Page 39

RONALD COHEN

MR. ROSEN: Objection.

Q. You can answer.

A. I don't know.

Q. If your position is that First Wives US/Australia is an alter ego of the debtor, then for purposes of transfers of its assets being assets of the debtor, then wouldn't you also have to acknowledge that if First Wives US/Australia received fair value then so did the debtor?

MR. ROSEN: Objection.

A. I don't think I have to acknowledge anything in this situation. All I have to do is prove less than fair value to this debtor.

Whether or not, you know, there was value to the First Wives Australia I guess is another question. Maybe it's a defense for you to allege, I'm not sure. But I don't think it's part of my burden here.

Q. Okay. I just want to understand, just want to understand your position.

RONALD COHEN

Entertainment Limited Liability Company, correct?
A. Yes, that's correct.
Q. Okay. It is true, is it not, that my client is the only person who received a transfer from First Wives US/Australia that you are seeking to recover as a transfer of property of the debtor, correct?
A. I don't believe any of these others involve the bank -- -- let's put it this way. At the time of -- at the time of -- at the time of the transfer to your client preceded all of these by approximately two months and I believe that at the time of the transfer to your client First Wives US was -- had just been formed, just been formed and organized and was in the process of getting a bank account opened which it subsequently did open. And I believe at some point as I said earlier, the money from First Wives Australia that was in its account, including money that was

RONALD COHEN

left after the $300,000 sent to your client, was put into the First Wives debtor bank account.
Q. Okay.
A. So that's what I believe was the facts. I believe that in all the complaints you've mentioned here --
Q. I'm going to cut you off here.
A. Fine.
Q. Because that wasn't the question I asked.
A. Okay.
Q. The question was have you brought any adversary proceedings against anybody other than my client who received funds from the First Wives US/Australia bank account?
A. No.
Q. Okay. Why not?
A. Well first of all, we had records going back only so far. And prior to filing of the complaint we reviewed certain documents and we noticed some information about this transfer. We

RONALD COHEN

noticed that it had gone out a day or so before the money was sent to First Wives US's bank account.
   We noticed that there was information concerning Mr. Charles in our files concerning his address and where he was.
   We thought, from maybe notes we had taken, that there's some involvement with Mr. -- I think it was Hassan in some way, I'm not sure, but there was some connection between those people. And when we saw in notes and emails references to the fact that people sending the money out believed this was property of the debtor and it was the debtor's property, did not refer to it as separate entity's property, we felt this was basis to bring a claim against Mr. Charles, particularly because we had the information that it was for Reachout Entertainment. It was stated right in an email it was repay a loan that Mr. Charles had made to Reachout

RONALD COHEN

Entertainment, not to First Wives Australia, not to First Wives US but to Reachout Entertainment.
   We felt this was a sufficient basis against this particular defendant to bring this suit. We did not have any of that information as to any other payments out from First Wives Australia's account.
Q. Did you have First Wives Australia's bank statements at the time?
A. We had First Wives -- yes, we had some First Wives Australia bank statements in the boxes that were in my office that had been received from Ms. Marino, Ms. Mazur-Marino her name is.
   MR. COHEN: Let's mark this one.
   (Exhibit 10, FWC US/Australia cash flow report was marked for identification.)
Q. Who is Ms. Mazur Marino?
A. She was the prior Chapter 7 trustee that I succeeded. Of the debtor

Page 92

RONALD COHEN

anything from Mr. Choueka or otherwise that would contradict it, correct?

MR. ROSEN: Objection.

A. I've never talked to Mr. Choueka, and otherwise I don't know who that would encompass. But certainly I have nothing from Mr. Choueka, I've never talked to him.

Q. You never heard otherwise from anybody, correct?

MR. ROSEN: Objection.

A. Otherwise that it was the intention to have these assets and liabilities both go over to First Wives, I haven't heard -- I have not heard that from anybody else that it wasn't.

Q. Okay. And you are confident that it was the intent to have the assets travel over, correct?

A. Well, the reason on the asset side I have more than little confidence is that there actually was asset transfers. I believe there was an assignment of the rights and I believe

Page 93

RONALD COHEN

there was a transfer of money in a bank account, maybe more than one transfer. I certainly noted there was a transfer right after your client got paid.

Q. And so given that transfer of all of the assets out of First Wives US/Australia to First Wives Entertainment, then really only one of two things is possible, right, either the debts traveled with the assets or that transfer of assets to the debtor was a fraudulent conveyance, correct?

MR. ROSEN: Objection.

A. That's two possibilities. There may be others.

Q. Can you think of any others?

A. Maybe it was an investment.

MR. ROSEN: Objection.

A. Maybe it was an investment. I don't know. Maybe it was -- maybe they were going to have the capital go to First Wives Australia. I don't know. There could be other things it was.

Q. Have you seen anything with

Page 94

RONALD COHEN

capital going to First Wives US/Australia?

A. No, I haven't. But doesn't escape me possible that there was other things going on. The fact that people intended to do one thing does not automatically mean that they did it, and it also doesn't mean intending to do one thing and doing that meant they did the other thing which is have the liabilities actually be assumed.

Q. Right.

A. And by the way, by the way just so it's clear, you know, the other claims we made against people who claim, who we've claimed were repaid by the debtor for having, on behalf of -- the other people who we have sued who we mentioned here in the earlier exhibits, 4 through whatever it was, 9, that we sued, were also alleged to have received -- Reachout Entertainment, made loans to Reachout Entertainment and received funds from the debtor. So it's right up

Page 95

RONALD COHEN

the same alley in my view as those claims.

Q. I want to focus on what you talked about with intent though for a second.

Because you said the fact that people intended to do one thing does not automatically mean that they did it, correct?

A. That's correct.

Q. Okay. And in fact the fact that people intend to do something doesn't mean they are legally barred from changing their minds, correct?

MR. ROSEN: Objection.

A. Legally barred? Of course they're not legally barred.

Q. Okay.

A. Change their minds all the time.

Q. And you'd agree that if between forming the intent to send all of these assets to First Wives Entertainment and the date of the actual asset transfer, they said, you know what? We want to

## Page 96

1  RONALD COHEN
2  use a different corporate structure,
3  we're not going to send the assets,
4  First Wives Entertainment Limited
5  Liability Company wouldn't have had any
6  claim to bring against US/Australia for
7  not sending the assets, would it?
8      MR. ROSEN: Objection. Can I go
9  to the bathroom?
10     MR. COHEN: After he answers this
11 question, yes.
12 A.  Can you repeat the question? I
13 was distracted.
14     (The requested portion of the
15 record was read.)
16 A.  I don't know of any legally
17 binding document that would have
18 required First Wives Australia to send
19 them to the debtor, so I guess the
20 answer is there would be no legal claim.
21 If the intent had changed and it was
22 just people talking on an email or in a
23 page like this, there would not be
24 legally enforceable by First Wives US to
25 get those assets.

## Page 97

1  RONALD COHEN
2  Q.  Thank you. Let's take a break.
3     (A recess was had.)
4     MR. COHEN: Let's mark this one.
5     (Exhibit 12, Complaint in Chapter
6  7 action was marked for
7  identification.)
8  Q.  I put in front of you exhibit 12
9  which is your complaint in this
10 adversary proceeding. Do you see that?
11     MR. RYU: If I'm not mistaken
12 this was actually exhibit 1 in the
13 prior deposition.
14     MR. COHEN: I had a feeling it
15 was, I just wasn't certain. Just for
16 ease of reference we'll call it 12
17 and it will be doubled up.
18 Q.  So exhibit 12 is your client in
19 this adversary proceeding, do you see
20 that?
21 A.  Yes, appears to be so, yes.
22 Q.  And if you turn to paragraph 6 of
23 exhibit 12, it is again identical to
24 those prior paragraphs and point to --
25 strike that.

## Page 98

1  RONALD COHEN
2     If you turn to paragraph 6 of
3  exhibit 12 it is again identical to the
4  paragraph 6s that we looked at before
5  and pointing to paragraph 31 for the
6  details of the transfer at issue,
7  correct?
8  A.  Yes.
9  Q.  If you then flip to paragraph 31,
10 you'll see the allegations of the
11 transfer here are again identical other
12 than the date of the transfer, the
13 alleged transfer and the amount of the
14 transfer, correct?
15     MR. ROSEN: Objection. You can
16 answer.
17 A.  Yes.
18 Q.  Only this time when your
19 complaint says its bank account, you're
20 not referring to First Wives
21 Entertainment Limited Liability Company
22 as you are every other time a complaint
23 uses the language its bank account;
24 you're referring to the bank account of
25 US/Australia limited, correct?

## Page 99

1  RONALD COHEN
2  A.  Yes, but we're also referring to,
3  which you didn't refer me to the last
4  phrase in paragraph 31 talks about a
5  transfer of an interest in the debtor's
6  property. I think our view is clear
7  that an interest in the debtor's
8  property can include interest that other
9  people have in their name, including in
10 their bank account. So I think it's
11 clear that the word its is to be taken
12 in context here and can have a broader
13 meaning and in this case does have a
14 broader meaning than in the other
15 complaint. So it all depends on context
16 as I kind of said earlier.
17 Q.  Is there anything -- well let's
18 put it this way. What fact alleged in
19 this complaint do you think puts Mr.
20 Charles on notice that the trustee's
21 position in this claim is that assets
22 that he received from a company other
23 than First Wives Entertainment Limited
24 Liability Company are property of the
25 debtor and were actually received from

RONALD COHEN
the debtor on an alter ego theory or on
your theory that a party's subjective
intent to subsequently send those assets
to the debtor makes it property in which
the debtor has an interest?
	MR. ROSEN: Objection.
	A.	You got a lot in there. But I
would go back to what I just said
previously in the last answer. We have
alleged that the debtor has interest in
that property and that's all that
transfer involved an interest of in the
debtor, an interest of the debtor in
that property. It isn't so limited to
the fact that someone else's name is on
the bank account. And if he -- if he
took that -- oh, I'm not worried it's
because that came from an Australian
bank account he didn't read the whole,
the whole allegation.
	So I think anyone looking at this
and looking at the whole allegation
would understand that we're claiming the
debtor had an interest in that property

RONALD COHEN
on October -- on August 25th, 2014.
	Q.	Even if it didn't come from the
debtor's bank account?
	MR. ROSEN: Objection.
	A.	Absolutely. Absolutely that's
what I said.
	Q.	Okay. Even though the allegation
was that it did come from the debtor's
bank account?
	MR. ROSEN: Objection. You're
misstating.
	A.	The allegation it came from its
bank account, it doesn't say who its
was. It doesn't mean the debtor as
Limited. It could mean other companies
in which the debtor either was going to
be receiving the assets from, shortly
thereafter as I've testified, or that
there was an intent that the debtor
receive those assets or there was
actually from the time it was all
formulated back in July as those earlier
emails referred to, intentionally going
to become the debtor.

RONALD COHEN
	Q.	Just grammatically you understand
that the word its is a pronoun that
refers to an antecedent noun, correct?
	MR. ROSEN: Wowza.
	A.	Yes, I understand it's a pronoun
and I understand it refers to debtor and
I understand the debtor can mean more
than just this entity because I
understand that the debtor's interest in
property can be in property that is not
in its name, is not in its current
possession or control or custody. It
could mean the debtor has an equitable
interest in property, could mean a lot
of things.
	So all of which is up for the
lawyers and the judge to decide in this
case. And as a matter of pleading, I
think it's understood that we don't have
to specifically state chapter and verse
of every possible theory in a pleading.
	Q.	You think you don't have to put
in a pleading --
	MR. ROSEN: Objection.

RONALD COHEN
	Q.	-- whose bank account the money
came out of?
	MR. ROSEN: Objection.
	A.	We did put in a bank account it
came out of.
	Q.	Plaintiffs, right?
	A.	What's that?
	Q.	Plaintiff's bank account?
	A.	We're claiming that it came out
of -- plaintiff. I'm the plaintiff. I
had no bank account. It's not me. It's
the debtor, okay? And who was the
debtor?
	Q.	Of the debtor's bank account,
correct?
	A.	Yes, the debtor's bank account,
yes.
	Q.	And the debtor's bank account in
your view is the bank account that is
not the debtor?
	MR. ROSEN: Objection.
	A.	That's not my statement. You're
mischaracterizing. It's the debtor's
bank account in the sense that money the

Page 104

```
 1           RONALD COHEN
 2   debtor had an interest in that money,
 3   was in that bank account, that's what
 4   we're talking about, not the bank
 5   account. Who cares about the bank
 6   account? We care about whose property
 7   it was. If you look at the word
 8   property that's the critical element,
 9   Mr. Cohen, not anything else. The
10   keywords in that sentence are debtor's
11   property. That's what I'm recovering.
12   That your client got a fraudulent
13   conveyance in our view and that's what
14   we are seeking to recover.
15      Q.  So do you think that the
16   allegation that you're seeking to avoid
17   the transfer of $300,000 from the
18   debtor's bank account was accurate or
19   inaccurate?
20          MR. ROSEN: Objection.
21      A.  Again you're misstating it.
22   Don't try to trap me. I've already
23   testified about the fact. The critical
24   fact is whose property it was. The bank
25   account it came out of in my view is not
```

Page 105

```
 1           RONALD COHEN
 2   the relevant important fact. It's the
 3   property interest that the debtor had in
 4   those funds.
 5      Q.  I understand.
 6      A.  And that's what we are suing you
 7   on. If I didn't allege that I wouldn't
 8   be here and your client wouldn't have
 9   been sued. I'm alleging it's the
10   debtor's property. You show the court
11   it's not and you win.
12      Q.  I understand that. I'm asking
13   you a different question. I understand
14   you have --
15      A.  No, you're trying to trap me into
16   a question to admit that the debtor name
17   was not on that particular bank account.
18   I'm not going. You can argue that as
19   relevant and important to you and in
20   your whatever it's going to be motion
21   you're going to make in this case. You
22   can allege all those things. I'm
23   telling you that our view is it was the
24   debtor's property and Mr. Choueka said
25   it was the debtor's property in the
```

Page 106

```
 1           RONALD COHEN
 2   email that he sent to the debtor's
 3   counsel. If you read that email it's
 4   very clear. You haven't even bothered
 5   to show me that. So that's what I'm
 6   talking about.
 7      Q.  I'd ask you to please stop
 8   yelling, sir.
 9      A.  I'm not yelling.
10          MR. ROSEN: He's not yelling.
11      A.  I raised my voice slightly but I
12   did not yell.
13      Q.  I'm not asking you right now
14   about this line that says it was a
15   transfer of an interest in the debtor's
16   property. You explained your view of
17   that line. Whether I agree with it or
18   not is irrelevant.
19          What I'm asking you now is this
20   other allegation that you pled in your
21   complaint which says that based on
22   plaintiff's analysis of the debtor's
23   financial affairs, plaintiff is seeking
24   to void the transfer of $300,000 from
25   its bank account. You agree that its in
```

Page 107

```
 1           RONALD COHEN
 2   that sentence refers to the debtor,
 3   correct?
 4      A.  Yes.
 5      Q.  Do you believe it was accurate
 6   when you allege that the money was
 7   transferred from the debtor's bank
 8   account, regardless of whether it had an
 9   interest in the property, was it the
10   debtor's bank account?
11          MR. ROSEN: Objection.
12      A.  The debtor did not have legal
13   title to that bank account at the time
14   of the transfer.
15      Q.  So that's a no, correct?
16          MR. ROSEN: No, that's not a no.
17      A.  That's my statement. They're not
18   legal title. You want more? I'll give
19   you more. Maybe you don't want me to
20   volunteer. I'll tell you I believe the
21   debtor had an equitable interest in that
22   bank account.
23      Q.  And what was the basis of that
24   equitable interest?
25          MR. ROSEN: We've been through
```

Page 108

RONALD COHEN

it.
A. We've been through that before.
Q. Because there was an intent to subsequently transfer the money, correct?
A. And a statement from the gentleman most in the position to know in his view it was the debtor's and the gentleman in question is Mr. Choueka.
Q. Just to be clear, that statement you're referring to is a two years later communication in the context of the bankruptcy, correct?
A. In which Mr. Choueka would have every -- yes, that's correct, would have every to tell the truth, would have every, because it is a federal crime to conceal things and I assume he did it in order to correct what he thought was some confusion. And I can't imagine any reason why he would not have been telling the truth in that.
But you're free to depose him and ask him questions directly as I haven't

Page 109

RONALD COHEN

even talked to him.
Q. You're not contending that that email was a business record of the defendants -- of the debtor's, excuse me, are you?
MR. ROSEN: Objection.
A. I don't know whether it is or isn't.
Q. Okay. Was it made in the debtor's ordinary course of business?
A. Again, I don't know that.
MR. ROSEN: Objection.
A. I don't know the answer to that question.
Q. Okay. Just checking.
MR. COHEN: Let mark this.
(Exhibit 13, Chase Bank account statement was marked for identification.)
Q. Before we move on from exhibit 12, I just want to wrap this up. At the time that you made the allegations in the adversary complaint, you were fully aware that the money had come out of

Page 110

RONALD COHEN

US/Australia's bank account and you were proceeding on the theory that debtor had an interest in that property even though it was in US/Australia's bank account, correct?
MR. ROSEN: Objection.
A. I think that's -- I think that's a fair statement, yes.
Q. Okay. Let's take a look at exhibit 13. And exhibit 13 I will represent to you are the bank account statements that your attorney produced to us for US/Australia that are dated after August 2014. So if you take a look, have you seen these bank statements before?
A. No. I'm aware that my attorney turned them over to you. He mentioned we were giving you the bank statements.
Q. If you take a look at AC 738 through 743 you'll see it's a Chase Bank statement for US/Australia Limited Liability Company from August 30th, 2014 through September 30th, 2014. Do you

Page 111

RONALD COHEN

see that?
A. Appears to be the case. Last page is blank, but yes.
Q. And you see there are deposits into that bank account of $1,205,460, do you see that?
A. I do see a deposit at the bottom, total of deposits on the bottom of the first page of exhibit 13.
Q. And you see also that the beginning balance in the account was $174,437.77, correct?
A. Yes, that's what it says.
Q. And then the ending balance after electronic withdrawals was about $2,778, do you see that?
A. Yes, I see that.
Q. So a significant amount of money, even after the transfer to First Wives Entertainment Limited Liability Company in August, was subsequently deposited into the accounts of this company First Wives US/Australia, correct?
A. Appears to be the case. It was

Page 160

RONALD COHEN
Wives Entertainment, even if all that is
accurately reflecting a loan, in your
view that doesn't have any bearing on
the payment to Andrew Charles?
    MR. ROSEN: Objection.
    Q. True or false?
    MR. ROSEN: Objection.
    A. I can't answer true or false.
All I can say is the entries, the
entries here are what they are. I have
no independent knowledge of them or even
nonindependent knowledge of them. The
only one that we actually went to look
at further was the one I mentioned a
minute ago to your client. The others I
have not looked at at all.
    Q. I appreciate that answer.
    A. By the way, I should say there
are some at the bottom that look very
familiar. All City is Richard
Pierpont's. So maybe I should say those
also have some relevance to me since
they refer to some of the complaints we
looked at.

Page 161

RONALD COHEN
    Q. My question is, do you think
there's any potential relevance to the
$1.3 million in loans reflected here if
those are accurate? I'm not asking you
if you did any due diligence. I know
you didn't. I'm asking you, assuming
those are accurate, would that have
relevance?
    MR. ROSEN: Objection.
    A. I did a limited amount of
diligence on these things because I did
verify in fact our bank account record
did show money going out to your client
and even that's how we found his address
because we didn't have it in our files
otherwise. So thank God that was there.
    Q. But you didn't do --
    A. The other thing that I would say
is that, and it's consistent with your
question, I believe, is that what
mattered to me were transfers of the
debtor's property or interest in the
debtor's property for which the debtor
did not receive equivalent value. And

Page 162

RONALD COHEN
when I saw something like that, that was
relevant to me.
    When I saw payment of loans that
others had made with the debtor's own --
loans to the debtor as opposed to loans
to ROE, I wasn't as interested because
that obviously was satisfying the
debtor's own debts. So what I was
concerned about was whether the debtor
was satisfying not its debts but another
parties' debts and that's what drew my
eye to things I mentioned.
    Q. So because if the debtor is
satisfying its own debts, then it's
getting reasonably equivalent value,
correct?
    A. In a general sense, yes. But I
would note that there are times when a
company may be satisfying debts, whether
their own debts or other peoples' debts,
and it isn't getting reasonably
equivalent value. For instance, if the
company was hopelessly insolvent at the
time it made those transfers I'm not

Page 163

RONALD COHEN
sure that paying those debts might not
be -- might not be considered reasonably
equivalent value.
    So there is a general rule like
everything is subject to maybe some
exceptions or some caveats that we would
have to at least deal with.
    Q. Understood. I don't think that's
accurate, but that's neither here nor
there.
    A. Whatever. Our view doesn't
matter, it's the judge's view that will
matter on that.
    Q. Exactly. But just to be clear,
in the time period after August 2014,
when you saw the debtor paying its own
debts, you weren't concerned that it was
getting -- wasn't getting reasonably
equivalent value because at that time if
it was paying off its own debts and
getting an elimination of an equivalent
amount of liability for the money that
it was paying out, in your view it was
getting reasonably equivalent value,

RONALD COHEN

correct?

MR. ROSEN: Objection.

A. In our view we were less concerned with that because it appeared it was paying for not just loans but also, for instance, invoices for services that were provided to it.

So, in a similar category to loans where people who had claims on the debtor because they had provided legal services or accounting services or production expenses or things that the debtor was on the hook for, we saw payments going out to call it talent.

The people that we saw names we recognized were involved with the show, Rupert Holmes was one name, Brian Holland was another name. There are a bunch of names in there, all of whom have something to do with the show. And I think they were clearly owed money by the debtor. We didn't challenge those.

Q. And also I think you mentioned the -- I forget his first name, but Mr.

RONALD COHEN

Ray, he had a loan to the company that the company paid back, you guys didn't try to claw that back?

A. I again didn't challenge that. There was the other two gentlemen, one gentleman with two transfers. I think his name was also Paul something but I forget. Gilchrist maybe?

Q. Yes.

A. Yes. We again did not challenge those. We had no information that they were paying somebody else's debts.

Q. Okay. Now, let me ask you a question. Just work with me for the hypothetical. If US/Australia -- let's take US/Australia out of this for a second.

If the debtor owed $300,000 to Reachout Entertainment and paid $300,000 to Reachout Entertainment, would that be a fraudulent conveyance in your view?

A. If it paid Reachout Entertainment directly as opposed to having someone pay it indirectly, yes, I believe that

RONALD COHEN

would not be a fraudulent transfer if they paid it directly.

When it's paid indirectly by paying a third party, I believe they run into problems.

Q. So if the debtor transfers $300,000 to Reachout Entertainment and Reachout Entertainment then transfers that same $300,000 to Andrew Charles and debtor cancels $300,000 of debt to Reachout Entertainment, then in your view that's reasonably equivalent value, that wouldn't be an issue. But if the debtor, instead of having that intermediate step, just gives the money to Andrew Charles directly and Reachout Entertainment cancels that same $300,000 of debt, then that's a fraudulent conveyance in your view?

A. It can be.

Q. What's the substantive difference to the debtor between those two transactions? In both cases, just to be clear, in both cases the debtor pays

RONALD COHEN

$300,000 and receives $300,000 of -- sorry, and eliminates $300,000 of debt that it owes to the same entity, Reachout Entertainment, so what is the substantive economic difference if the money goes to Reachout directly or to Andrew Charles?

A. The value, the initial value from the transfer went to Reachout when its debt to Charles was canceled.

We conferred a benefit on Reachout from doing that. I believe that any benefit we got from conferring of that benefit on Reachout, and Mr. Charles was the ultimate beneficiary here, you know, is a problem, for instance, if we did not get anything of value back. And I don't believe that if we're insolvent at the time we do that transfer we are really getting anything back.

As I said earlier, we may be a little less insolvent. But we're still insolvent. There's no benefit to us for

Page 168

```
 1    RONALD COHEN
 2  having discharged a third party's debt
 3  in this case, notwithstanding your
 4  original hypothetical, if the payments
 5  had been made A to B and then B to C,
 6  there would be no direct claim because
 7  they decided to do it directly from A to
 8  C here, I think you run into a problem
 9  in the fraudulent transfer context.
10  That's my basis.
11     Q.  What is the economic difference
12  to the debtor if the money is paid
13  directly?
14     A.  The debtor is out $300,000 to
15  Charles that it wouldn't otherwise be
16  out if it paid, if it paid directly and
17  it had value and value came to it.  But
18  value didn't come to it.
19     Q.  Hold on.  If it paid Reachout
20  directly and got a cancellation of that
21  amount of debt for that payment then it
22  would have gotten value, yes?
23     A.  In the event that the debtor was
24  solvent and it could pay its bills.
25  Otherwise, yes, I believe there would be
```

Page 169

```
 1    RONALD COHEN
 2  value to the debtor for having paid
 3  Reachout in this situation, or it pays
 4  Reachout directly.
 5     Q.  Again, you were aware of a number
 6  of payments to Reachout directly during
 7  the same time period that you chose not
 8  to bring a fraudulent conveyance claim,
 9  correct?
10     A.  I don't know that I had --
11        MR. ROSEN:  Objection.
12     A.  -- conveyance claim against
13  Reachout.  Reachout may have been a
14  creditor of the debtor.  I'm not sure
15  about that.  But it appeared that again
16  Reachout was defunct and Mr. Charles is
17  not defunct.  So therefore we went after
18  the person we can go after which is a
19  trustee's right to do I understand.
20     Q.  I understand that a fraudulent
21  conveyance, if it's conveyed, you can
22  actually go to any subsequent, go after
23  any subsequent transferee as well,
24  correct?
25     A.  But the subsequent transferee has
```

Page 170

```
 1    RONALD COHEN
 2  claims, defenses I should say that a
 3  direct transferee would not.  Why would
 4  I do that where I have direct transfers
 5  to Charles from our bank account or
 6  Australia's bank account or whoever's
 7  bank account?  Why should I have to
 8  bother going through a subsequent
 9  transferee when I have him as a initial
10  transferee?
11     Q.  It's looks like they paid out
12  between May of 2014 through November of
13  2014, $1,142,000 to Reachout
14  Entertainment.  Do you see that
15  reflected there?
16     A.  Only claims from May forward are
17  relevant.  And again, if on the books of
18  the debtor Reachout Entertainment was a
19  creditor and made loans and they were
20  paying those loans back, typically that
21  would not be a fraudulent transfer.
22       The other side of the coin is,
23  however, is that there is no -- it's not
24  clear to me that when the debtor makes a
25  payment on behalf of Reachout
```

Page 171

```
 1    RONALD COHEN
 2  Entertainment that that's the same as
 3  making a payment to Reachout.
 4     Q.  So the payment on behalf of
 5  Reachout is that payment that's
 6  reflected here, it's booked on 8/25/14
 7  which we know is inaccurate, but it's
 8  booked here on 8/25 on behalf of
 9  Reachout to Andrew Charles for $300,000.
10  You see that?
11     A.  That's one of the ones I've sued
12  about, yes.
13     Q.  And that payment is actually
14  reflected in this return of loan column
15  here for Reachout Entertainment, do you
16  see that?
17     A.  I see that.  But the critical
18  thing is --
19     Q.  No, that's the answer --
20     A.  Mr. Charles is the transferee and
21  not Reachout.  That's the critical fact,
22  Mr. Cohen, you are ignoring.  Just like
23  Andrew Charles's name, All City
24  Surgical, Richard Pierpont are also
25  named.  They were all sued.
```

Page 184

RONALD COHEN

A. I don't think it's an accounting question frankly, I think it's a legal question.
Q. Did you ask anybody for help in assessing that, or did you make that assessment on your own?
A. My counsel has advised me on the legal questions. I have counsel in this case. And I can't tell you what we talked about.
Q. I'm not going to ask you what you talked about. Other than advice of counsel, did you do anything personally to verify the claims that you're making, that the debtor did not receive fair value in exchange for these payments?
MR. ROSEN: Objection. That's been asked and answered about 40 times.
Q. You can answer it again.
A. No, I did not do anything. I did refer at one point to a discussion we had with Mr. Baer and he did bring some of these payments to our attention. But

Page 185

RONALD COHEN

it wasn't just his say so that we relied on. We relied on the bank account records and the emails I referred to and other matters to kind of clarify that in our view payment of a third party's debts was not necessarily value to the debtor whereas payments of its own debts would be.
Q. And that's why again you weren't bringing a claim for payment of its own debts to Reachout Entertainment?
A. I believe the record shows that our claims were only made payments on behalf of Reachout Entertainment which I understand by the way was itself insolvent and defunct and not in a position to be paid because clearly they would have been a beneficiary of these payments, and I believe under the fraudulent transfer laws, you can check if I'm wrong, I can actually sue the party for whose benefit any transfer was made. And I clearly believe in this situation Reachout was a party to whose

Page 186

RONALD COHEN

benefit these transfers were made.
Q. Clearly?
A. And clearly if they were not defunct and were operating and had cash in a bank account and were a real going concern I would have sued them as well.
Q. But only on these payments, not on the payments made directly to them?
A. I would not have bothered to sue them for the payments that were their own.
Q. And you were aware of the payments directly to Reachout?
A. There may have been preferences but I won't get into that and those fraudulent transfers.
Q. But you were aware that there were payments made directly to Reachout on account of loans that Reachout had made to the debtor, correct?
A. I've now become aware of that and I do believe that the schedule that we saw, that Mr. Baer showed us originally which has been produced to you, I

Page 187

RONALD COHEN

believe, did show some of these payments directly to Reachout. Some of the ones that are on here were certainly on that schedule. Maybe all of them, but certainly some of them looked like they were there.
Q. Did you do anything to investigate whether the payments that were made on behalf of Reachout reduced the debtor's outstanding debt to Reachout?
A. No.
MR. COHEN: Let's take a ten minute break if you don't mind.
(A recess was had.)
(Exhibit 16, JPMorgan Chase report or advice of debit was marked for identification.)
Q. You have in front you a document that's been marked as exhibit 16. Do you recognize it?
A. Yes. This one I've seen.
Q. And what do you recognize it as?
A. I recognize it on the stationery